# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

*******************************************

UNITED STATES OF AMERICA,

       v.                           Docket No.:   5:23-CR-00079 (BKS)

AUSTIN TENNANT,

               Defendant.

*******************************************

## GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM DEFENDANT'S SOCIAL MEDIA ACCOUNTS

Dated: August 21, 2023

                          CARLA B. FREEDMAN
                          United States Attorney
                          Northern District of New York

                 By: */s/ Adrian S. LaRochelle*
                     */s/ Paul J. Tuck*
                     Adrian S. LaRochelle (Bar Roll No. 701266)
                     Paul J. Tuck (Bar Roll No. 520814)
                     Assistant United States Attorneys

## I.    INTRODUCTION

Austin Tennant (the "defendant") has moved to suppress "all evidence obtained through warrantless searches of his social media accounts." Dkt. No. 38. According to the defendant, those "warrantless searches" were the internal reviews by Instagram, Discord, and Snapchat (collectively, the "ESPs") of information on their own platforms that precipitated CyberTips each sent to the National Center for Missing and Exploited Children ("NCMEC"). The defendant seeks to suppress "that evidence [(the CyberTips and the images and attribution evidence found therein as well as follow-on search warrants to those ESPs)] because the warrantless searches violated the Fourth Amendment." Dkt. No. 38-2 at 2. The defendant's motion should be denied for the reasons set forth below as should his request for a hearing as the defendant has not established any disputed issues of fact that would require one.

First, the defendant had no reasonable expectation of privacy in the child pornography he uploaded to his various social media accounts—much of which he made publicly available. But even assuming the defendant did have a reasonable expectation of privacy, his motion should still be denied. The ESPs are private businesses with a commercial interest in ridding their platforms of child sexual abuse material ("CSAM"). The CyberTips they generated based on private searches of information on their platforms do not implicate the Fourth Amendment. As such, the longstanding private-search exception to the warrant requirement applies because law enforcement and NCMEC (assuming NCMEC was a government actor) did not exceed the scope of the private searches the ESPs conducted. Accordingly, there was no Fourth Amendment violation, and the Court should deny the motion on that basis.

Even if a Fourth Amendment violation occurred in connection with one or more of the CyberTips, the requested relief is not warranted. The exclusionary rule should not apply because law enforcement acted objectively reasonably in believing its review of the files and related

information included within the CyberTips was permissible under existing law. In any event, there was sufficient, untainted probable cause to support each challenged warrant.

## II.    BACKGROUND AND APPLICABLE CONTEXT

### a.    NCMEC and the CyberTipline

NCMEC is a private, nonprofit corporation, incorporated under the laws of the District of Columbia. NCMEC's mission is to help find missing children, reduce child sexual exploitation, and prevent child victimization. *See* Aff. of Susan Lafontant (Exhibit M, "NCMEC Aff."), at ¶ 2.

NCMEC created the CyberTipline in January 1997 and began operating the CyberTipline on March 9, 1998, in furtherance of its private mission to serve as the national resource center and clearinghouse concerning online child sexual exploitation. *See id.* at ¶ 3. The CyberTipline was created to allow persons to report online (and via toll-free telephone) the enticement of children for sexual acts, child sexual molestation, child pornography, child sex tourism, child sex trafficking, unsolicited obscene materials sent to a child, misleading domain names, misleading words or digital images on the Internet. The majority of CyberTipline reports (CyberTips) NCMEC receives relate to apparent child pornography and are from ESPs. *See id.*

NCMEC staff cannot alter or change information submitted by a reporting party to the CyberTipline. *See id.* at ¶ 4. Except for the incident type, date, and time, NCMEC does not direct or mandate the type of information that a member of the public or an ESP may choose to submit in a CyberTip. *See id.* NCMEC provides voluntary reporting fields that a member of the public or an ESP may choose to populate with information. *See id.*

The front page of each CyberTip indicates a date and time that the report was created upon submission of the report content by the reporting person or reporting ESP. *See id.* at ¶ 5. The front page also lists an Incident Type for the report and the number of total uploaded files, if any, submitted by the reporting ESP. *See id.*

CyberTips contain Sections A through D. Section A of a CyberTip contains information submitted by the reporting person or reporting ESP. *See id.* at ¶ 7. NCMEC staff cannot revise or edit any information contained in Section A. *See id.* Other than the "Incident Type" and "Incident Time" fields in Section A, all information provided by the reporting person or reporting ESP in any other fields is voluntary. *See id.* Section B of a CyberTip contains information that NCMEC Systems automatically generate based on information provided by a reporting ESP. *See id.* at ¶ 8. Section C of a CyberTip contains additional information compiled and documented by NCMEC based on the information submitted in Section A. *See id.* at ¶ 9. Section D of a CyberTip contains information documented by NCMEC relating to the law enforcement agency to which the CyberTip was made available. *See id.* at ¶ 10.

**b.    The ESPs relevant to this case**

Each of the ESPs that generated CyberTips in connection with this case—Discord, Snapchat, and Instagram—are private businesses that own and operate online social networking platforms that provide various services to its users. In offering such services, the ESPs have a business interest in ridding their platforms of illicit and/or unlawful conduct and material, including CSAM. *See* Aff. of Tyler Harmon ("Instagram Aff." Ex. N) (stating "Meta has a private, independent business interest in keeping its platform safe and free from harmful content and conduct, including that which sexually exploits children."); Aff. of Alexander Brian Barczak ("Snap Aff" Ex. O) (stating "Snap has a strong business interest in enforcing its Terms of Service and associated Community Guidelines and strives to ensure that its products are free of illegal content, and in particular, Child Sexual Exploitation and Abuse Imagery[.]").[1] Each ESP uses

---

[1] Discord has indicated that it intends to provide an affidavit explaining its business practices for the Court's consideration. As of the response deadline, Discord has not sent the affidavit, but we will file it upon receipt.

hash-matching technology to monitor for the upload and transfer of CSAM. *See* Ex. N at ⁋ 3; Ex. O at ⁋ 11. If the ESPs discover such material, further internal review of the material is conducted. *See* Ex. N at ⁋⁋ 3–4; Ex. O at ⁋⁋ 11–12.

Each ESP is also legally obligated to report the discovery of CSAM to NCMEC in the form of a CyberTip to NCMEC's CyberTipline. *See* 18 U.S.C. § 2258A(f).

**c.     The CyberTips in this case**

Between June of 2021 and October of 2022, the ESPs submitted CyberTips to NCMEC, which are attached to the affidavit of Paul Tuck as Exhibits A–L. Each CyberTip has a unique number; provides a description of the files associated with it; states whether the files were viewed by the ESP; and notes if the files are publicly available. As noted above, only a CyberTip's Incident Date and Type fields are required by federal law. The rest of the fields are voluntarily provided by the reporting ESP. The chart below provides some of the basic information related to the relevant CyberTips:

| CyberTip No. | ESP | Date | Files | All Files Reviewed by the ESP? | All Files Publicly Available? | Files viewed by NCMEC |
|---|---|---|---|---|---|---|
| 87232205 (Ex. A) | Snapchat | 3/3/21 | 7 | Not provided | YES | NO |
| 88898921 (Ex. B) | Snapchat | 4/13/21 | 2 | Not provided | YES | NO |
| 92616570 (Ex. C) | Snapchat | 6/10/21 | 1 | YES | YES | NO |
| 116612117 (Ex. D) | Instagram | 1/26/22 | 1 | NO | Not provided | NO |
| 123623081 (Ex. E) | Snapchat | 4/30/22 | 3 | YES | NO | YES (1 of 3) |
| 123940318 (Ex. F) | Snapchat | 5/4/22 | 1 | YES | NO | NO |
| 124080432 (Ex. G) | Instagram | 5/5/22 | 1 | NO | Not provided | NO |
| 126172992 (Ex. H) | Snapchat | 5/29/22 | 1 | YES | NO | YES |
| 136275941 (Ex. I) | Discord | 10/10/22 | 1 | YES | YES | YES |
| 136275942 (Ex. J) | Discord | 10/10/22 | 1 | YES | YES | YES |
| 138051748 (Ex. K) | Snapchat | 11/1/22 | 1 | YES | NO | YES |
| 139232954 (Ex. L) | Discord | 11/22/22 | 1 | YES | YES | NO |

As demonstrated above, all but four of the CyberTips explicitly state that a human employee at the ESP had viewed the entire contents of each CSAM file referenced therein. Six of the twelve note that the entire contents of each file were publicly available. CyberTips 116612117 (Ex. D) and 124080432 (Ex. G) do not provide information related to whether the files were

publicly available and state that an employee did not review them. However, these two CyberTips explained that the ESP had identified these files using hash matching technology, and the ESP had previously categorized these files as CSAM. *See* Ex. D at 5; Ex. G at 5; Ex. N. at ¶¶ 5–6.

###    d.    *The subsequent investigation*

NCMEC forwards CyberTips to law enforcement based on geolocation for Internet Protocol (IP) addresses associated with the potentially unlawful activity. Here, NCMEC forwarded the CyberTips to the New York State Police and later the Oswego County Sheriff's Office. Subsequent investigation linked the activity in each CyberTip to the defendant.

As part of its investigation and relying, in part, on the information provided in the CyberTips, Oswego County Sheriff's Office Investigator Robert Obrist applied for and obtained several state search warrants. Specifically, based in part on information from the CyberTips, on January 12, 2023, Investigator Obrist obtained warrants to search the defendant's Snapchat and Discord accounts. On January 23, 2023, again relying in part on information from the CyberTips, Investigator Obrist obtained a search warrant for the defendant's residence, his person, and several vehicles associated with him. In outlining the probable cause to support each warrant, in addition to other information, Investigator Obrist described certain CSAM files he had reviewed that had been submitted to NCMEC by the ESPs as part of the CyberTips mentioned above. *See* Dkt. No. 38-1, Ex. A, B, and C. The subsequent execution of each warrant, in turn, revealed substantial additional evidence of the defendant's child pornography crimes.

## III.    THE DEFENDANT'S MOTION IS MERITLESS

In support of his motion, the defendant argues that there was government action. *See* Dkt. No 38-2 at 4. In doing so, the defendant incorrectly asserts that the relevant ESPs—Snapchat, Discord, and Instagram—"acted as government actors in this case." Dkt. No. 38-2 at 6. Without citing any evidence, he claims "the government knew of and acquiesced to Snapchat, Discord, and

Instagram monitoring [the defendant's] online activity." *See id.* He goes on to argue that "these entities are linked [to NCMEC] through federal statutes that mandate electronic service providers to report suspect child pornography to NCMEC, impose penalties for failure to do so, and require them to preserve evidence." *Id.* (citation omitted). The defendant then asserts, again citing no evidence, that the ESPs "intended to assist NCMEC's law enforcement efforts when they monitored [the defendant's] accounts." *Id.* Finally, inconsistent with applicable precedent, the defendant quotes *Ackerman* to suggest that "in order for there to be a lack of agency, it must be shown that the putative agent 'bears *no intention* to assist the government.'" *Id.* at 6–7 (quoting *Ackerman*, 831 F.3d at 1303). This quote is taken out of context, however, because *Ackerman* did not hold that there is a rebuttable presumption in favor of agency only defeated by a showing that a putative agent "bears no intention to assist the government." That formulation of the test would turn *every* private citizen who reports criminal conduct into an agent of the state. The real test, discussed in more detail below, is far more limited and cannot be met here.

Next, the defendant asserts he had a reasonable expectation of privacy in the information disclosed in the CyberTips. In doing so, he misstates that the "images [were] contained in [the defendant's] *private* correspondence." Dkt. No. 38-2 at 7 (emphasis added). As referenced above and as more fully laid out in the CyberTips attached hereto, six of the twelve CyberTips reported that the entire contents of the relevant CSAM files were "publicly available." The defendant also fails to address whether he has a reasonable expectation of privacy in CSAM images placed on private websites that specifically forbid doing so and affirmatively state in their terms and conditions that they will not tolerate such activity. He further fails to address case law that concludes it is unreasonable to have an expectation of privacy in CSAM images.

Finally, the defendant contends that, because the ESPs, NCMEC, and Investigator Obrist failed to obtain search warrants before looking at the files associated with the CyberTips, the

searches of his accounts were unconstitutional. *See id.* at 8. In doing so, he asserts that the private-search exception to the warrant requirement no longer applies in this context. *See id.* at 9. Specifically, the defendant states the private-search exception "does not apply to 'searches' under the intrusion-on-constitutionally-protected-area test articulated in *Jones*." *Id.* (citing *Ackerman*, 831 F.3d at 1307). *Ackerman*, however, had nothing to do with the overall applicability of the private-search exception. Indeed, the portion of *Ackerman* cited to by the defendant was considering when a search "<u>exceeded</u> the scope of the search previously performed by the private party . . . [.]" *Ackerman*, 831 F.3d at 1307 (emphasis added). To that end, *Ackerman* questioned whether a search that *exceeded* the scope of the private search may still be permissible where the aggrieved party preserves an expectation of privacy in the material searched. The facts in *Ackerman* were an extreme example in that NCMEC had opened attachments in an email that the ESP had never viewed or even categorized. It is misleading at best to claim that the private-search exception is no longer good law after *Ackerman*. Rather, *Ackerman* applied the private-search exception to find that the relevant government search exceeded the private one.[2] Here, there is no evidence that NCMEC or Investigator Obrist exceeded the scope of the original (private) ESP search and the exception, therefore, applies.

---

[2] To be sure, *Ackerman* questioned whether *United States v. Jacobsen*, 466 U.S. 109 (1984), remained good law after *United States v. Jones*, 565 U.S. 400 (2012), but only in a very limited sense. *Ackerman* opined—in clear dicta—that the circumstance in *Jacobsen*, where an officer removed and destroyed a small amount of powder to conduct a drug test on material a private party previously discovered, may no longer be permissible (because it exceeded the original private search). In other words, *Ackerman*, at best, questioned the *scope* of the private-search exception not its viability.

## IV.    THE ESPs, NCMEC, AND LAW ENFORCEMENT DID NOT VIOLATE THE FOURTH AMENDMENT

### a.    Basic principles of the Fourth Amendment

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. Amend. IV. Fourth Amendment protections attach when a "search" occurs. A "search" occurs when the government infringes on an expectation of privacy that society is prepared to consider reasonable, *see Jacobsen*, 466 U.S. at 115, or where the government physically intrudes on a constitutionally protected area for the purpose of obtaining information, *see United States v. Jones*, 565 U.S. 400, 407–08 (2012). Fourth Amendment protections do not apply to a private search. *Jacobsen*, 466 U.S. at 113. Nor do they apply if the government merely replicates a private search. *Id*. at 115

### b.    The defendant did not have a legitimate expectation of privacy

The Fourth Amendment applies to government searches where the defendant has established a legitimate expectation of privacy in the area searched. *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990).

#### 1.    There was no expectation of privacy for any of the publicly available files

The Supreme Court has repeatedly explained that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection"). The defendant claims "[p]rivate messages on social media are, like email, 'inherently private' because such messages 'are not readily accessible to the general public.'" Dkt. No. 38-2 at 7. The defendant appears to ignore the facts and context of the relevant CyberTips.

Here, six of the twelve CyberTips state the entire contents of the CSAM referenced therein was "publicly available." In other words, the defendant made the CSAM accessible to third parties (other than the private ESPs themselves) in some form. Thus, the appropriate question, with respect to these CyberTips, is whether the defendant maintained a reasonable expectation of privacy in the face of public disclosure of that material. He did not.

Federal courts of appeals that have examined the privacy implications of searching peer-to-peer networks for files potentially containing CSAM have concluded that a search of publicly available information does not violate a computer user's reasonable expectation of privacy. For example, in *United States v. Borowy*, 595 F.3d 1045 (9th Cir. 2010), the Ninth Circuit rejected the argument that the defendant had a reasonable expectation of privacy in files that were shared on a peer-to-peer file sharing site, even though the defendant intended to maintain the files as private. *See id.* at 1048 ("[Defendant's] subjective intention not to share his files did not create an objectively reasonable expectation of privacy in the face of such widespread public access."). Other court have come to the same conclusion. *See United States v. Thomas*, No. 5:12-CR-37, 2013 WL 6000484, at *19 (D. Vt. Nov. 8, 2013), *aff'd*, 788 F.3d 345 (2d Cir. 2015); *United States v. Norman*, 448 F. App'x 895, 897 (11th Cir. 2011) (concluding that the search of defendant's computer did not constitute an unlawful search because "the contents of the shared folder on [defendant's] computer were knowable to law enforcement without physical intrusion in[to] [defendant's] house because this information was also available to members of the public"); *United States v. Stults*, 575 F.3d 834, 843 (8th Cir. 2009) (concluding that defendant "had no reasonable expectation of privacy in files that the FBI retrieved from his personal computer where [defendant] admittedly installed and used Limewire to make his files accessible to others for file sharing").

As such, the fact that the defendant made the relevant material available to the third parties is dispositive since warrantless searches of publicly available information do not implicate the

Fourth Amendment. *See United States v. Thompson*, No. 1:21-CR-190, 2023 WL 424212, at \*4 (D.N.D. Jan. 26, 2023) (finding that the defendant lacked an objectively reasonable expectation of privacy to Snapchat files that were denoted as "publicly available" in the relevant CyberTip). Therefore, the seizure of the files themselves and subsequent use of information contained in CyberTips 87232205 (Ex. A), 8889821 (Ex. B), 92616570 (Ex. C), 136275941 (Ex. I), 136275942 (Ex. J), 138051748 (Ex. K), and 139232954 (Ex. L), to obtain search warrants does not violate the defendant's Fourth Amendment rights.

### 2.    *Any expectation of privacy was unreasonable*

With respect to the other CyberTips, the inquiry is slightly different, but the result is the same. To determine whether a person has a legitimate expectation of privacy in the area searched "involves two separate inquiries: first, [the defendant] must demonstrate a subjective expectation of privacy in a searched place or item; and second, his expectation must be one that society accepts as reasonable." *Chuang*, 897 F.2d at 649.[3]

The defendant has not established that he had a subjective expectation of privacy in the contraband files the ESPs referenced in the relevant CyberTips. The ESPs expressly inform their users that they will monitor user conduct on their platforms for violations of the ESPs' terms of service or applicable law—including information that is not publicly available. For example, Snapchat's terms of service, state that, "[b]y using Snapchat, Bitmoji, or any of our other products or services that are subject to these Terms (which we refer to collectively as the "Services"), you agree to the Terms."[4] Snapchat's privacy policy, which is incorporated into Snapchat's terms of

---

[3] At the outset, the defendant has yet to assert any ownership interest in the social media accounts at issue and therefore has not established standing to seek suppression of evidence found therein let alone a reasonable expectation of privacy in that evidence. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978).

[4] Snap Inc. Terms of Service – Snap Inc., https://snap.com/en-US/prior-terms (last visited August 7, 2023).

service, also explains that Snapchat may share user information to, "enforce, investigate, and report conduct violating our Terms of Service and other usage policies, respond to requests from law enforcement, and comply with legal requirements."[5] Similarly, Discord's applicable terms of service expressly tell its users that, "[t]hese terms set forth our legal obligations to each other. They apply to your use of our services."[6] Discord's privacy policy, as incorporated into its terms of service, explains that, "[w]e may disclose information in response to a request for information if we believe disclosure is required by law, including meeting national security or law enforcement requirements."[7] The privacy policy of Meta, Instagram's parent company, expressly tells its users that, "[w]e access, preserve and share your information with regulators, law enforcement or others . . . [i]n response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so."[8]

Here, the defendant chose to use platforms operated and maintained by the ESPs, which are all private businesses that expressly reserve the right to monitor content on their systems for illegal material. When the ESPs learned that the defendant's accounts were involved in the uploading and/or transferring CSAM, the ESPs submitted the CSAM files to NCEMC pursuant to the ESPs' obligations under section 2258A(a), and consistent with their stated policies. Thus, any

---

[5] Privacy Policy – Data Policy – Snap Inc., https://values.snap.com/privacy/prior-privacy-policy (last visited August 7, 2023).

[6] Terms of Service | Discord, https://discord.com/terms/terms-of-service-march-2022 (last visited August 7, 2023).

[7] Privacy Policy | Discord, https://discord.com/terms/privacy-policy-march-2022 (last visited August 7, 2023).

[8] Facebook, https://www.facebook.com/privacy/policy/version/20220104/ (last visited August 7, 2023).

subjective expectation of privacy that the defendant had in those files was not objectively reasonable.

### 3.    There is no expectation of privacy for child pornography files

The government is not aware of authority within the Second Circuit as to whether a person has a reasonable expectation of privacy in contraband files uploaded to an ESP's platform when the terms of service prohibit it.[9] The Seventh Circuit, addressed a similar issue in *United States v. Bebris*, 4 F.4th 551, 557 (7th Cir. 2021), and found that the district court properly quashed a defense subpoena to Facebook after finding that the defendant "lacked a reasonable expectation of privacy in his messages because Facebook's Community Standards and terms of service warned users that Facebook reports child pornography if it becomes aware that is being sent."

The logic in *Bebris* applies here. The ESPs tell their users that they search user content on their platforms for contraband, and federal law makes clear that the ESPs are required to disclose any CSAM that the ESPs find on their systems. In addition, a cursory review of publicly available information shows that the ESPs do, in fact, implement and enforce their policies. [10]

---

[9] In *United States v. Wilbert*, 818 F. App'x 113, 114 (2d Cir. 2020), the Second Circuit assumed without deciding that a peer-to-peer program user retained a reasonable expectation of privacy in child exploitation images he uploaded.

[10] *See* Snapchat Transparency Report, July 1, 2022 – December 31, 2022 (June 20, 2023), https://values.snap.com/privacy/transparency (last visited August 7, 2023) ("Our Trust & Safety team uses active technology detection tools, such as PhotoDNA robust hash-matching and Google's Child Sexual Abuse Imagery (CSAI) Match to identify known illegal images and videos of child sexual abuse, respectively, and report them to the U.S. National Center for Missing and Exploited Children (NCMEC), as required by law. NCMEC then, in turn, coordinates with domestic or international law enforcement, as required.); How We Enforce Rules, Working with Law Enforcement, https://discord.com/safety/360044157931-working-with-law-enforcement (last visited August 7, 2023) ("When we are made aware of potential Child Safety concerns on our platform, our Trust & Safety team reviews the content and reports the content to the National Center for Missing and Exploited Children (NCMEC) or law enforcement where appropriate as required by 18 U.S.C. § 2258A. NCMEC will then work with local and international law enforcement as necessary.); Meta, Preventing Child Exploitation on Our Apps (February 23, 2021), https://about.fb.com/news/2021/02/preventing-child-exploitation-on-our-apps/ (last visited August 7, 2023) ("The second [tool Meta uses to reduce sharing of CSAM] is a safety alert that

District courts outside of this Circuit have followed this logic and reached similar conclusions to the Seventh Circuit in *Bebris*. *See, e.g.*, *United States v. Stratton*, 229 F. Supp. 3d 1230, 1241 (D. Kan. 2017) (no reasonable expectation of privacy because network users were required to agree to provider's terms of service in which provider reserved right to monitor online activity on network and which warned users that they were prohibited from using network to violate laws, and that any information acquired while monitoring users' activities could be turned over to law enforcement authorities); *United States v. Sporn*, Case No. 21-10016-EFM, 2022 WL 656165, at *10 (D. Kan. Mar. 4, 2022) ("Defendant has pointed to no decision holding a social media user enjoys a reasonable expectation of privacy where the platform deploys a similarly robust reservation of rights by its [terms of service]. The Court finds under the circumstances of the case and in light of Twitter's express zero tolerance policy for child sexual exploitation, once Defendant violated that policy, he lacked a reasonable expectation of privacy in the Twitter account."); *United States v. Tolbert*, Cr. No. 14-3761 JCH, 2019 WL 2931659, at *4 (D.N.M. July 7, 2019) ("[I]t appears to the Court that due to the terms of AOL's Privacy Policy, Community Guidelines, and Terms of Service ("TOS"), to which he agreed, [the defendant] lacked a reasonable expectation of privacy in his emails that contained child pornography. Other courts have reached the same or similar conclusion with regard to defendants accused of using AOL to transmit child pornography.").

Because the defendant has not established a legitimate and subjective expectation of privacy, and because any such expectation is not one society is prepared to accept, this Court should follow the reasoning of the Seventh Circuit and deny the defendant's motion to suppress

---

informs people who have shared viral, meme child exploitative content about the harm it can cause and warns that it is against our policies and there are legal consequences for sharing this material. We share this safety alert in addition to removing the content, banking it and reporting it to NCMEC.")

because the defendant lacks a Fourth Amendment interest in the contraband files he uploaded to the ESPs. *See Illinois v. Caballes*, 543 U.S. 405, 408–409 (2005) ("We have held that any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interest.' This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'") (quoting *Jacobsen*, 466 U.S. at 122–23) (punctuation omitted in *Caballes*)).

      **c.**      **The government did not exceed the scope of the private searches**

Even if the defendant had a reasonable expectation of privacy in the contraband he uploaded to or shared on his social media accounts, he still cannot show that a government actor violated his constitutional rights. No court to consider the issue has ever found that ESPs are government actors for complying with their statutory obligation to report CSAM discovered on their platforms to NCMEC. This court should, for the reasons set forth below, continue that tradition and find that the ESPs here were not government actors.

The question of whether the ESPs served as an agent of the government in performing searches of the defendant's accounts for CSAM "necessarily turns on the degree of the Government's participation in [the ESP's] activities." *Shepherd*, 646 F. App'x at 388 (quoting *Skinner*, 489 U.S. at 614). Here, the defendant has not presented any evidence that NCMEC or law enforcement instigated, encouraged, or participated in the search of the defendant's Instagram, Snapchat, or Discord accounts. Further, he does not contend that NCMEC or law enforcement asked the ESPs to perform searches of his accounts.[11]

---

[11] And nor could he. The ESP affidavits and publicly available information state that Instagram, Snapchat, and Discord have a private interest in removing CSAM from their sites. *See* Ex. N, ¶ 2; Ex. O, ¶ 8; *supra* note 10. In other words, they searched the defendant's accounts for CSAM

Rather, the defendant's primary argument is that the ESPs' statutory link with NCMEC makes them government actors. *See* Dkt. No. 38-2 at 6 (noting that "NCMEC and the [ESPs] are linked through federal statutes . . ."). As far as the government's research reveals, when considering this issue, courts have uniformly held that a nexus to NCMEC does not transform an ESP into a government actor. *See United States v. Stevenson*, 727 F.3d 826, 831 (8th Cir. 2013) ("A reporting requirement, standing alone, does not transform an [i]nternet service provider into a government agent whenever it chooses to scan files sent on its network for child pornography."); *United States v. Cameron*, 699 F.3d 621, 638 (1st Cir. 2012) (finding Yahoo! was not acting as an agent of the government in conducting a search of defendant's account and reporting its findings to NCMEC, stating "if Yahoo! chose to implement a policy of searching for child pornography, it presumably did so for its own interests."); *United States v. Richardson*, 607 F.3d 357, 366 (4th Cir. 2010) (holding that AOL's scanning of email communications for child pornography and reporting discoveries to NCMEC did not trigger the Fourth Amendment's warrant requirement because no law enforcement officer or agency asked the provider to search or scan the defendant's emails); *United States v. Stratton*, No. 15-40084, 2017 WL 169041, at **4–5 (D. Kan. Jan. 7, 2017) (finding Sony was not acting as government agent when it monitored its users' accounts for child pornography because it was acting to protect its own interest in providing a safe online gaming community); *United States v. Miller*, No. 8:15-cr-172, 2015 WL 5824024, at *4 (D. Neb. Oct. 6, 2015) ("Google did not become a state actor by providing the reports required by law."); *United States v. Keith*, 980 F. Supp. 2d 33, 44 (D. Mass. 2013) (finding AOL, motivated by its own wholly private interests in monitoring emails for child pornography, was not acting as a government agent in searching its network for child pornography and reporting any findings to NCMEC). And that

---

because they had a vested interest in not permitting people like the defendant to use their platforms for illegal conduct.

makes sense. Nothing in federal law encourages the *investigation* by ESPs of suspected CSAM on their platforms, it simply requires *reporting* if such material is discovered. *See* 18 U.S.C. § 2258A(f).[12]

In *United States v. Miller*, 982 F.3d 412, 426 (6th Cir. 2020), the Sixth Circuit carefully analyzed a similar argument and held that Google was not a government actor. There, the Court found that "Google's hash-value matching . . . did not implicate the Fourth Amendment." *Id. Miller* is consistent with similar holdings from around the country concerning ESPs that utilize hash matching technologies, like PhotoDNA, to surveil their platforms for CSAM. *See Bebris*, 4 F.4th 551, 558 (7th Cir. 2021) (finding Facebook did not act as a government actor when it used its PhotoDNA technology to scan its infrastructure for child exploitation material); *United States v. Ringland*, 966 F.3d 731, 736 (8th Cir. 2020) ("Google did not act as a government agent because it scanned its users' emails volitionally and out of its own private business interests. Google did not become a government agent merely because it had a mutual interest in eradicating child pornography from its platform."); *United States v. Cameron*, 699 F.3d 621, 638 (1st Cir. 2012) ("We will not find that a private party has acted as an agent of the government 'simply because the government has a stake in the outcome of a search.'"); *United States v. Stevenson*, 727 F.3d 826, 830 (8th Cir. 2013) ("A reporting requirement, standing alone, does not transform an Internet service provider into a government agent whenever it chooses to scan files sent on its network for child pornography."); *United States v. Rosenow*, 33 F.4th 529, 540 (9th Cir. 2022) (rejecting argument that 18 U.S.C. § 2252A transforms private electronic service providers into government

---

[12] The statute specifically states that it does not impose such a requirement: "[n]othing in this section shall be construed to require an electronic communication service provider . . . to – (1) monitor any user, subscriber, or customer of that provider; (2) monitor the content of any communication of any person described in paragraph (1); or (3) affirmatively seek facts or circumstances described in sections (a) and (b)." 18 U.S.C. § 2258A(f).

actors when they search their infrastructure for child exploitation material of their own volition and then report instances of suspected child exploitation material to NCMEC as required by law).

Here, the defendant fails to offer any persuasive reason to find that the ESPs are government actors. Factually, the defendant cites to no evidence to support his claim that, "as the CyberTips indicate," the ESPs "fully intended to assist NCMEC and law enforcement." Dkt. No. 38-2 at 7. The CyberTips do not contain any information to support such a claim. And even if such a claim was supported, ESPs can "voluntarily choose to have the same interest" as the government without transforming themselves into government actors. *Cameron*, 699 F.3d at 638.

Instead, as discussed above, the defendant mischaracterizes *Ackerman* to flip agency law on its head. The weight of the law on this issue, however, firmly supports a finding that the ESPs in this case are not government actors. Therefore, the searches of the defendant's social media accounts conducted by the ESPs and the subsequent reporting of CSAM found therein to NCMEC do not implicate the Fourth Amendment.

> **d.    Because private actors completed the relevant searches, the private-search exception to the warrant requirement applies**

The private-search exception provides that Fourth Amendment protections do not apply to a private search, *Jacobsen*, 466 U.S. at 113, nor do they apply if the government merely replicates a prior private search, *id.* at 115. Here, as noted above, private parties—the ESPs—searched the defendant's accounts and those searches do not implicate the Fourth Amendment. The question then becomes: did NCMEC[13] or law enforcement exceed the scope of the private search? No government actor exceeded the private searches and thus there is no Fourth Amendment violation.

---

[13] The defendant claims that NCMEC is a government actor. The government disagrees and notes that courts have held that it is not a government actor. *See e.g.*, *United States v. Meals*, 21 F.4th 903, 908 (5th Cir. 2021). But, in this case, it does not matter because NCMEC did not exceed the scope of the private search.

### 1.    *NCMEC's action in this case*

NCMEC's involvement with the CyberTips was limited to receiving information from the ESPs, reviewing the designated CSAM material only when the ESP indicated that an employee had already reviewed it, running automated database queries of publicly available information (*e.g.*, geolocation of IP addresses), and providing that compiled information to law enforcement. *See* Ex. M, ¶¶ 7–10.[14] As such, NCMEC's review of CSAM provided by the ESPs as part of the CyberTips, did not exceed the scope of the private searches the ESPs had previously conducted.

### 2.    *Investigator Obrist's review of the files*

As explained below, Investigator Obrist's review of the files contained in the CyberTips did not constitute a "search" subject to Fourth Amendment scrutiny because his review mirrored the ESPs' searches.

### 3.    *The private search exception applies to all of the CyberTips*

Given that NCMEC's and Investigator Obrist's review of the CyberTips was limited to the substantially the same search as the private party, the Fourth Amendment is not implicated. This conclusion is plainly true for all the CyberTips that note that a human employee at the ESP reviewed the files as they sat in the defendant's accounts on their infrastructure. The private-search exception also applies to CSAM included by the ESP as part of CyberTips where an employee did not review the file as it sat in the defendant's accounts. In those instances, Investigator Obrist's review was after the ESPs identified the files as CSAM via their internal hash-matching of the files against material that the ESP had previously reviewed and categorized as CSAM. *See* Ex. N at ¶ 3 (stating that Meta uses a "hash technology to find exact or near exact copies of images or videos that a Meta employee or contractor previously viewed and confirmed as apparent child

---

[14] *See* Ex. A at 6; Ex. B at 6; Ex. C at 7; Ex. D at 8; Ex. E at 7; Ex. F at 7; Ex. G at 7; Ex. H at 7; Ex. I at 7; Ex. J at 8; Ex. K at 6; Ex. L at 7.

pornography . . .”); Ex. O at ⁋ 11. In other words, the computer hash-matching simply demonstrated that the image is the same one that a human previously reviewed. Thus, Investigator Obrist's viewing of the files to confirm their character did not exceed the scope of the ESPs' searches.

Notably, the Second Circuit has not weighed in on whether hash matching is akin to a human review of the relevant files. But, this Court is not without guidance. For example, in *United States v. Knoll*, 16 F.3d 1313, 1320–21 (2d Cir. 1994), the Second Circuit explained in the context of a private search of physical files that, "[i]f the files were closed and their contents not apparent from the exterior, the reasonable expectation of privacy continued so long as the files had not been searched before contract with the government occurred. Otherwise, the expectation of privacy would have been frustrated and at an end." *id.* (citing *Jacobsen*, 446 U.S. at 117). Applied to the technology here, the "content" of the file was "apparent from the exterior" after the ESP's private search because the hash value match revealed the file's content as CSAM to a virtual certainty.[15]

Among the Circuits that have addressed whether the private-search exception applies in this context two have said yes (the Fifth and Sixth) and one has said no (the Ninth).

*Miller* explained that the first question is whether the technology at issue is sufficiently reliable. *Miller* went to great lengths to explain that hash matching technology is "highly reliable – akin to the reliability of DNA." *Id.* (citations omitted). *Miller* pointed out that the evidence in one case suggested that "[t]he chance of two files coincidentally sharing the same hash value is 1 in 9,223,372,036,854,775,808." *United States v. Dunning*, 2015 WL 13736169, at *2 (E.D. Ky. Oct. 1, 2015) (citation omitted). (That is 1 in 9.2 quintillion). Likewise, the Fifth Circuit, in *United*

---

[15] Instagram went a step further and provided an industry classification label to the files noting that the video associated with 116612117 was "B1" (meaning pubescent minor engaged in a sex act) and the video associated with 12408043 was "A1" (meaning a prepubescent minor engaged in a sex act).

*States v. Reddick* stated, "hash value comparison 'allows law enforcement to identify child pornography with almost absolute certainty,' since hash values are 'specific to the makeup of a particular image's data.'" 900 F. 3d 636, 639 (5th Cir. 2018).

This case is substantially like *Reddick*. There, the Court considered Microsoft's PhotoDNA software (the same tool Snapchat uses). *Reddick* found that the defendant's "set of computer files[] was inspected and deemed suspicious by a private actor" because they were scanned when they were uploaded but a human never reviewed the images. *Id.* at 639. The Court found that this was a "private search" and "when [the investigator] opened the files, there was no 'significant expansion of the search that had been conducted previously by a private party' sufficient to constitute 'a separate search.'" *Id.* (citation omitted). *Reddick* held that the investigator's "visual review of the suspect images—a step which merely dispelled any residual doubt about the contents of the files—was akin to the government agents' decision to conduct chemical tests on the white powder in *Jacobsen*." *Id.* at 639.

As *Reddick* and *Miller* explain, under the private-search doctrine the second question is whether there was a "virtual certainty" that when Investigator Obrist reviewed the files in question he would see the CSAM file that a human at the ESP had previously categorized and which was assigned a digital fingerprint. 982 F.3d at 430 (citing *Jacobson*). The answer to that question is a resounding "yes." As such, this Court should follow the holdings in the Fifth and Sixth Circuit, as well as other rulings within this district,[16] which are consistent with *Knoll*, and determine that the private-search exception applies to CyberTips were the CSAM was not reviewed by a human as those files sat in the defendant's account before being reported by the ESPs to NCMEC.

---

[16] *See United States v. Maher*, Case No. 5:21-cr-00275-GTS, Dkt. No. 48, at *29 (N.D.N.Y Aug. 22, 2022) ("The Court accordingly has no doubt it was a 'virtual certainty' that the image Investigator Croneiser viewed would be child pornography, due to the high reliability of Google's hashing technology.") The defendant in *Maher* has appealed this ruling and the appeal is pending.

e.      **Suppression of evidence is not the appropriate remedy if a Fourth Amendment violation is found**

Even if a Fourth Amendment violation has occurred, suppression of evidence "is not an automatic consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 137 (2009). Even where a violation occurs, "the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Id.*

In *United States v. Leon*, 468 U.S. 897, 919 (1984), the Supreme Court said that "[i]f the purpose of the [Fourth Amendment's] exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). "[T]he exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Herring v*, 555 U.S. at 141. "In addition, the benefits of deterrence must outweigh the costs." *Id.* (citation omitted). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Id.* (citation omitted). "[T]he rule's costly toll upon truthseeking and law enforcement objectives presents a high obstacle for those urging [its] application." *United States v. Scott*, 524 U.S. 357, 364–65 (1998). The test for whether an officer's actions should trigger suppression of evidence is objective. *Leon*, 468 U.S. at 922 ("[O]ur good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances.").

Here, a reasonably well-trained officer would not have known that his review of a file attached to the ESPs' CyberTips was illegal. The private-search exception has been around since *Jacobsen* and has been applied in the Second Circuit. *See generally Davis v. United States*, 564

21

U.S. 229, 239 (2011) (evidence obtained in objectively reasonable reliance on judicial precedent that is subsequently overruled is covered by the good faith exception to the warrant requirement). Each of the CyberTips, except CyberTips 116612117 and 124080432 as mentioned above, clearly informed Investigator Obrist that either a human at the ESP had reviewed the entire contents of files and determined them to be child pornography, using the federal definition, or that the entire contents of the file was publicly available. CyberTips 116612117 and 124080432 indicated that the relevant files had been hash-matched against CSAM that had been previously reviewed and categorized by an actual human at the ESP.[17] Because "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," it should not apply where, as here, the actions of Investigator Obrist were not objectively "sufficiently culpable such that deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144–45; *see Maher*, Case No. 5:21-cr-00275-GTS, Dkt. No. 48, at *29.

### f.    Independent untainted probable cause supports the warrants

"[A]lthough unlawfully obtained evidence should not be included in an affidavit, it is well established that 'the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant.'" *United States v. Peeples*, 962 F.3d 677, 688 (2d Cir. 2020) (quoting *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997)).

Thus, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Trzaska*, 111 F.3d at 1026. "The ultimate issue is whether . . . there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). If so, the warrant is valid, and evidence seized during

---

[17] *See* Ex. N. at ¶¶ 3, 5, 6.

its execution will not be suppressed. *Id.* at 719; *see also United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir. 1985) ("To have the evidence seized pursuant to the search warrant suppressed, [the defendant] must . . . show that there was not a sufficient residue of probable cause to support the warrant, without considering the [unlawfully obtained evidence] . . . .").

Probable cause is a "practical, commonsense decision [that], given all the circumstances set forth in the affidavit . . ., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The probable cause inquiry turns on an "assessment of probabilities in particular factual contexts . . . and inferences, not on proof of specific criminal conduct beyond a reasonable doubt or even by a preponderance of the evidence." *Id.* at 76. Because probable cause is a "flexible, common-sense standard," an affidavit need only provide the issuing official with a "substantial basis for determining [its] existence." *Gates*, 462 U.S. at 239.

Each warrant application cited by the defendant and attached to his motion, has significant information that supports issuance of the requested warrant including evidence from interviews with the defendant, search warrants for electronic devices, and citizen reports. *See* Dkt. 38-1, Ex. A–C. In other words, probable cause to search the accounts and the defendant's residence existed without a further visual description of the files associated with the CyberTips (*i.e.*, the only potentially tainted facts in the application).[18]

_____

[18] Indeed, the CyberTip contained sufficient information that the file was likely child pornography and that it was found within the account to be searched absent visual review. Courts have found that probable cause to search exists based on the mere existence of a CyberTip. *See Adams v. State*, 316 So. 3d 260, 266 (Ala. Crim. App. 2020) ("tip from [an] internet company [is presumably] reliable based on the mandatory federal reporting requirements."); *State v. Woldridge*, 958 So. 2d 455, 457 (Fla. Dist. Ct. App. 2007) (the Florida District Court of Appeal held that a CyberTip submitted by AOL and described in a warrant application established probable cause to search a residence even without a description of the reported child pornography files because it included the reports from NCMEC, the detective's background in investigating on-line child pornography

Therefore, even after excluding any reference to the visual depictions referenced in the CyberTips, the seizure of evidence pursuant to those warrants was supported by untainted independent probable cause and should be admissible at trial.

## V.    THE DEFENDANT HAS NOT MET HIS BURDEN OF ESTABLISHING A HEARING ON THE MOTION IS NECESSARY

In the Second Circuit, "[a]n evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (citations and quotations omitted). "Before a defendant is entitled to a suppression hearing and to compel the government to meet its burden of proof, he must meet his burden of production." *United States v. Tudoran*, 476 F. Supp. 2d 205, 217 (N.D.N.Y. 2007). To meet that burden, the defendant must demonstrate the existence of "disputed issues of fact that would justify an evidentiary hearing." *United States v. Guadalupe*, 363 F. Supp. 2d 79, 81 (D. Conn. 2004) (citing *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969)); see also *United States v. Rush*, 352 F. Supp. 2d 383, 386 (E.D.N.Y. 2005) (the defendant bears the burden of showing the existence of a disputed issues of material fact necessitating a hearing). "A hearing is not necessary if the defendant's allegations are general . . . [or] conclusory," *United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989).

Here, the defendant has not provided an affidavit establishing any disputed issues of fact that would justify a hearing. The contents of the CyberTips at issue are not disputed. Further, the only affidavit provided is that of defense counsel and the assertions therein relate to undisputed facts regarding the state search warrants attached as exhibits to the defendant's motion and the

---

cases, and additional information to confirm where the defendant was living and receiving internet access).

redactions thereto. Therefore, the defendant has not met his burden of production and the defendant's request for a hearing should be denied.

## VI.     CONCLUSION

For the above reasons, defendant's motion should be denied in its entirety without a hearing.

**CERTIFICATE OF SERVICE**

I hereby certify that the government's Memorandum of Law was filed via the Court's ECF system on August 21, 2023, and that counsel of record received contemporaneous notification via email of such filing.

By:     /s/ Paul J. Tuck